UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| **PENNY HIGDON** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. 4:10-cv-00922-SNLJ |
| | ) | |
| **CHRYSLER GROUP, LLC** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

Plaintiff has filed this multicount action alleging discrimination and retaliation in violation of various sections of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111 et. seq., against Defendant Chrysler Group, LLC. Plaintiff alleges Defendant failed to accommodate her disabilities and later denied her benefits after she filed a discrimination claim with the EEOC. This matter is before the Court on Defendant Chrysler Group, LLC's motion for Summary Judgment [44], filed June 17, 2011. Responsive pleadings have been filed, and the matter is now ripe for disposition.

**I.    Factual Background**

The following facts are uncontested except where noted. Plaintiff Penny Higdon was employed by Defendant Chrysler Group, LLC as an assembly line worker at Defendant's Fenton, Missouri facility. Plaintiff was a member of United Auto Workers Local 136 for the duration of her employment with Defendant. In 2006, Plaintiff suffered a workplace injury which ultimately led to this litigation.

   A. *Plaintiff's Injuries*

On May 3, 2006, Plaintiff fell while at work and injured her right shoulder. Plaintiff consulted with Dr. Paul Malak, Defendant's contracted medical personnel. Plaintiff returned to her regular position on the assembly line following her consultation with Dr. Malak. After approximately three weeks without any significant improvement to Plaintiff's shoulder, Dr. Malak referred Plaintiff to Dr. Hulsey, an orthopedic surgeon. Following a consultation and examination on May 31, 2006, Dr. Hulsey diagnosed Plaintiff with a torn right rotator cuff. Dr. Hulsey determined that Plaintiff would require surgery. Plaintiff underwent surgery to repair her torn right rotator cuff on June 6, 2006.

Following the June, 2006, surgery, Plaintiff was given a series of work restrictions which included no use of her upper right arm, no lifting overhead with her right arm, and no climbing, pushing or pulling. Plaintiff was released to return to limited work duty on November 13, 2006, on the condition that Plaintiff not use her right arm or lift more than 25 lbs. On November 15, 2006, Plaintiff began a temporary position working on union business. Plaintiff made calls on the Union's behalf to help organize holiday baskets and aid in other charitable activities. Some time thereafter, Plaintiff was able to return to the assembly line as an inspector. She was capable of performing her inspector position given her work restrictions concerning her right shoulder. [Def. Ex. A, Plaintiff's Deposition, 93:1-94:23, 110:7-113:9] [46-2].

Along with her right shoulder injury, Plaintiff also experienced neck pain as a result of her May, 2006, fall. In October, 2007, Plaintiff consulted with another specialist, Dr. James Coyle, regarding her neck. Dr. Coyle determined a neck fusion surgery was required, and operated on the Plaintiff on October 19, 2007. On February 20, 2008, Plaintiff reached maximum medical improvement and returned to work in an inspector position. Plaintiff was given work restrictions

by Dr. Coyle that prevented her from performing any activity above shoulder level.

Subsequent to her February, 2008 return to work, Plaintiff was diagnosed with a re-torn right rotator cuff. Dr. Hulsey performed a second surgery to repair Plaintiff's right rotator cuff on May 12, 2008. Following the May 12, 2008 surgery, Plaintiff remained off of work and received workers' compensation benefits. On September 8, 2008, Plaintiff was diagnosed with a third tear of her right rotator cuff. Dr. Hulsey did not recommend surgery after the third tear. On September 18, 2008, Plaintiff reached maximum medical improvement and Dr. Hulsey gave her a series of permanent work restrictions. Plaintiff's permanent restrictions prohibit her from engaging in any activity above shoulder level; pushing or pulling; lifting 5 lbs or more from floor to chest with her right arm; and carrying more than 10 lbs.

*B. Plaintiff's Post-Surgery Employment Status*

Following Plaintiff's second rotator cuff surgery Defendant classified her as "Code 54", which was Chrysler's internal code for employees on workers' compensation leave. Plaintiff remained on Code 54 following the expiration of her workers' compensation benefits although still on medical leave. In addition to Code 54, Defendant uses "Code 31" to refer to employees who are unable to return to work in the facility but are not on workers' compensation leave for a work-related injury. After achieving maximum medical improvement in September, 2008, Plaintiff spoke with Dr. Malak, Defendant's contracted medical personnel, about finding a job within the plant to accommodate her permanent work restrictions. Dr. Malak suggested Plaintiff speak with Defendant's personnel department. Plaintiff spoke with Defendant's personnel department, which informed Plaintiff there were no current positions available that met her permanent restrictions. The personnel department further advised Plaintiff to stay on workers'

compensation until Defendant located a new position for her.

Subsequent to her September, 2008 communication with Defendant's personnel department, Plaintiff was contacted by Defendant regarding a possible position she might be able to fill in the paint department. Plaintiff met with Dr. Malak concerning her ability to perform the integral functions of the paint department job. Plaintiff contends Dr. Malak indicated Plaintiff could perform the subject job if provided with a stick to raise and lower vehicle hoods; while Defendant contends Dr. Malak's recommendation regarding the use of a stick was not made in connection with the alleged paint department job. [Pl. Statement of Uncontroverted Facts ¶ 22] [Doc. 50]; [51]. Dr. Malak's records indicate that he did not recommend the paint department position for Plaintiff and that it was his professional medical opinion that the position was not within Plaintiff's permanent medical restrictions. [46-9]. Further, Dr. Malak's records do not contain any notations regarding any possible accommodation for the subject paint department position. [46-9]. Plaintiff was not given a position in the paint department.

Plaintiff continued to see Dr. Malak every three months to monitor her progress. Plaintiff regularly asked Dr. Malak if he was aware of any available positions which Plaintiff could perform given her medical restrictions. Dr. Malak answered in the negative each time. Plaintiff inquired with Dr. Malak about two specific positions, a receptionist position and a data-entry position, that Plaintiff believed she could perform within her permanent work restrictions. Plaintiff believed each position was filled by employees with less seniority that Plaintiff had. [Plaintiff's Depo., 134:10-136:24] [46-2]. Plaintiff learned of each position by discussing them with the employees who held them. [Plaintiff's Depo., 134:10-136:24] [46-2]. There is no evidence before the Court that either position was vacant when Plaintiff spoke with Dr. Malak. Further, there is no evidence

before the Court that Plaintiff spoke with anyone in Defendant's personnel department regarding either position.

### C. *Plaintiff's EEOC Claim and Defendant's Alleged Retaliation*

While out on medical leave, Plaintiff continued to receive workers' compensation benefits even beyond the point at which she reached maximum medical improvement. Defendant terminated Plaintiff's worker's compensation benefits on February 18, 2009.

Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission on March 16, 2009, asserting Defendant failed to accommodate her disabilities by failing to place her in a position consistent with her permanent medical restrictions.

In April 2009, Plaintiff began receiving unemployment compensation payments from the State of Missouri. Under the collective bargaining agreement (CBA) between Defendant and the United Auto Workers, Local 136, Defendant's employees may be eligible for SUB-pay. SUB-pay provides Defendant's former employees who are receiving unemployment benefits with additional compensation to supplement state unemployment benefits. Employees who are on Code 54 leave are unable to receive SUB-pay benefits. Code 31 employees, however, are eligible for SUB-pay benefits. Plaintiff initially applied for SUB-pay benefits after she began receiving unemployment benefits from Missouri. Defendant informed Plaintiff via mail on April 29, 2009 that her initial SUB-pay application was denied because she was still classified as on Code 54 leave. This classification, however, appears to have been in error because by then Plaintiff was no longer receiving workers' compensation benefits. Plaintiff applied for SUB-Pay benefits several times between April of 2009 and June of 2010, and Defendant sent Plaintiff similar mailings providing identical reasons why her applications were rejected each time. [46-11].

Later in 2009, Chrysler offered senior employees an opportunity to participate in an incentive based retirement plan, known as Incentive Plan - Retirement (IPR). The IPR offer included regular retirement plan benefits under the Chrysler-UAW Pension Plan plus a $50,000 lump sum and a $25,000 voucher toward the purchase of a new Chrysler vehicle. Acceptance of the IPR offer required all applicants to agree to waive and release all pending claims or other grievances against Chrysler or its subsidiaries. On or about August 31, 2009, Plaintiff applied for the IPR program. Strictly for the purposes of Plaintiff's IPR program application, Dr. Malak reinstated Plaintiff to active employment and Defendant removed Plaintiff from Code 54 status for the first time since her May, 2008 surgery to repair her second torn rotator cuff.

In submitting her IPR application, Plaintiff indicated in a handwritten modification to the IPR letter that she still had an EEOC claim pending. Defendant's personnel department informed Plaintiff she would be unable to submit an application containing her modification. After her application was rejected, Plaintiff was reclassified as being on Code 54 leave.

Subsequently, Plaintiff filed another IPR application which did not contain any additional writings. On September 1, 2009, Plaintiff was informed her second IPR application had been rejected due to her Code 54 status. [Def. Ex. B, Deposition of Janice Carroll, 66:10 -86:10] [46-12; 46-13]. Donnie Ackerman, the President of UAW Local 136, informed Plaintiff her application had been pulled because of "litigation pending." Plaintiff cannot recall anyone other than Mr. Ackerman informing her that her application had been pulled due to her pending EEOC claim or any other litigation.

On November 17, 2009, Plaintiff filed a second charge with the EEOC which alleged unlawful retaliation.

For reasons unknown and at a time unclear, Plaintiff pursued a disputed workers' compensation claim against Defendant regarding her May, 2006 work-related injuries. On April 22, 2010, the Missouri Department of Labor and Industrial Relations settled the claim. The language of the settlement agreement contains a clause which states, "The employee understands and agrees that this agreement will not result in the changing of any personnel code to a Code 54." Plaintiff, who was on Code 54 prior to entering into the worker's compensation settlement with Defendant, remained on Code 54 following the settlement. On January 31, 2011, Plaintiff formally retired from Defendant under the standard terms of the CBA between the Defendant and the United Auto Workers, Local 136.

### D. *Plaintiff's Physical Limitations*

Currently, Plaintiff is unable to perform overhead tasks, engage in any activities requiring pushing or pulling, lift more than 5 lbs from the floor, or carry more than 10 lbs. Plaintiff also has some difficulty sleeping. Plaintiff sleeps roughly five to six hours per night, and frequently wakes up from discomfort. In order to sleep, Plaintiff must use two pillows and cannot lay on her right side. Plaintiff also has difficulty performing certain domestic chores, such as making a bed, due to her pushing and pulling restrictions. Plaintiff has some difficulty performing personal tasks, such as washing and styling her hair.

Plaintiff also experiences minor pain when walking long distances or standing for prolonged periods of time, though her discomfort is not constantly present when performing either activity. Additionally, Plaintiff points out she cannot perform certain home maintenance activities such as painting and raking leaves. Plaintiff is also unable to play catch or swim with her grandchildren.

Plaintiff does not have any limitations concerning her ability to drive. Additionally, she is not currently on any pain medication related to her shoulder or neck injuries.

**II.     Summary Judgment Standard**

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established a right to judgment with such clarity as to not give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). A motion seeking summary judgment should be examined in discrimination cases just as it is in other types of cases. Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) ("There is no 'discrimination case exception' to the application of summary judgment."). Pursuant to Federal Rule of Civil Procedure 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467 (1962). The burden is on the moving party. City of Mt. Pleasant, Iowa v. Assoc. of Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more that show there is some doubt as to the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for in its favor. Celotex v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

In ruling on a motion for summary judgment, the Court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences

that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983). The Court is required to resolve all conflicts of evidence in favor of the non-moving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). With these principles in mind, the Court turns to the discussion of the merits of Plaintiff's claims.

**III. Discussion**

*A. Plaintiff's Discrimination Claim*

Plaintiff claims Defendant discriminated against her by failing to find or place her in a position which accommodated her disabilities. The ADA prohibits discrimination "against a qualified individual with a disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12111(a). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position such individual holds or desires." 42 U.S.C. § 12111(8). To establish a *prima facie* case of discrmination under the ADA, a plaintiff must establish that (1) he or she is disabled within the meaning of the ADA; (2) he or she is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) he or she suffered an adverse employment action udner circumstances giving rise to an inference of unlawful discrimination based on disability. Samuels v. Kansas City, Missouri School Dist., 437 F.3d 797, 801 (8th Cir. 2006); Bass v. SBC Communications, 418 F.3d 870, 873 (8th Cir. 2005).

The ADA defines "disability" as a "physical . . . impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1)(B). A physical impairment

can be "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems." 29 C.F.R. § 1630.2(h)(1). Major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating and working." 42 U.S.C. § 12102(2)(A); Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184 (2002).

Finally, a plaintiff must show that the limitation on the major life activity is substantial. A "substantial limitation" is not a limitation which only interferes in a minor way with a major life activity. Toyota Motors Mfg., 534 U.S. at 195-98; *see* Moysis v. DTG Datanet, 278 F.3d 819, 825 (8th Cir. 2002) (the ADA "addresses substantial limitations on major life activities, not utter inabilities"). The impairment must also be permanent or long-term. Toyota Motors Mfg., 534 U.S. at 195-98. Thus, a physical impairment substantially limits a major life activity if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(ii).

"Determining whether an individual has a qualifying disability (under the ADA) requires an individualized analysis of the claimed impairment." Battle v. United Parcel Service, 438 F.3d 856, 861 (8th Cir. 2006). Plaintiff's primary argument is that she is substantially limited in performing the major life activity of "lifting." Plaintiff points to the permanent restrictions imposed by her physician on her ability to lift or carry weight. While "lifting" is among the enumerated categories of the ADA, the Eighth Circuit Court of Appeals has repeatedly held that a general lifting restriction imposed by a physician, without more, is insufficient to constitute a substantial limitation within the meaning of the ADA. Brunko v. Mercy Hospital, 260 F.3d 939, 941 (8th

Cir. 2001); Gutridge v. Cure, 153 F.3d 898, 901 (8th Cir. 1998); Snow v. Ridgeview Medical Center, 128 F.3d 1201 (8th Cir. 1997). As a result, Plaintiff's lifting restrictions, though not insignificant, are not a disability under the ADA and cannot form the basis of her ADA claim.

Plaintiff next argues that she is substantially limited in the major life activities of walking and standing. Plaintiff avers she is disabled because she experiences minor back pain when walking long distances or standing. It is well established that the ability to walk is a major life activity within the meaning of the ADA. Gretillat v. Care Initiatives, 481 F.3d 649, 653 (8th Cir. 2007). However, difficulty walking long distances does not constitute a disability under the ADA. Weber v. Strippit, Inc., 186 F.3d 907, 914 (8th Cir. 1999). Further, a limited standing limitation does not amount to a disability under the ADA. Gretillat, 481 F.3d at 653. Plaintiff's deposition indicates she experiences back pain while standing only "sometimes." [Plaintiff's Depo., 203:2] [46-3]. Further, Plaintiff's deposition indicates she experiences back pain while walking only "sometimes," and only when Plaintiff walks "very far." [Plaintiff's Depo., 202:13-14] [46-3]. The relative infrequency and circumstances under which Plaintiff experiences discomfort lead the Court to conclude that Plaintiff's abilities to stand and walk are not substantially limited in comparison to the average person in the general population. Accordingly, Plaintiff's discomfort standing for prolonged periods and discomfort when walking long distances cannot form the basis of her ADA discrimination claim.

Plaintiff further argues that she is disabled because she cannot adequately perform the basic life activity of sleeping. Plaintiff complains of difficulty sleeping due to pain and discomfort from her neck and shoulder injuries such that she gets only between five and six hours of sleep nightly. [Plaintiff's Depo.,197:14] [46-3]. However, the inability to sleep for less than five hours

per night is not a substantial limitation on the major life activity of sleeping. Nuzum v. Ozark Automotive Distributors, Inc., 432 F.3d 839, 848 (8th Cir. 2005); *see* Swanson v. University of Cincinnati, 268 F.3d 307, 316 (6th Cir. 2001) ("While less than five hours of sleep is not optimal, it is not significantly restricted in comparison to the average person in the general population"). Though Plaintiff testified that she wakes frequently from discomfort in her shoulder and neck, she is able to get about five or six hours of sleep every night. Because Plaintiff is able to get between five and six hours of sleep nightly, her ability to sleep is not substantially limited in comparison to the average person in the general population. Plaintiff's trouble sleeping, therefore, cannot form the basis for her ADA discrimination claim.

Plaintiff finally points to an inability to paint, rake leaves, play catch, swim with her grandchildren, place a fitted sheet on a bed, and difficulty washing and styling her hair, as substantial limitations on major life activities. [Plaintiff's Depo., 194:3 - 201:24] [46-3]. While Plaintiff's inability to engage in each of the aforementioned activities is unfortunate and certainly inconvenient, none of the aforementioned activities constitute major life activities pursuant to ADA. Accordingly, none of the aforementioned inabilities or difficulties can form the basis of Plaintiff's ADA claim.

Defendant has met its burden of demonstrating that there are no genuine issues of material fact in dispute concerning Plaintiff's claimed disabilities. The degree of Plaintiff's injuries are undisputed. Plaintiff, therefore, must do more than cast doubt upon certain facts, and must show specific facts indicating she is substantially limited in the performance of a major life activity. Plaintiff has not sufficiently made such a showing. Plaintiff's undisputed injuries and limitations do not inhibit a major life activity as defined by the Americans with Disabilities Act. Accordingly,

Plaintiff is not disabled within the meaning of the Americans with Disabilities Act. Because Plaintiff is not disabled under the Americans with Disabilities Act, Plaintiff cannot meet her burden of establishing a *prima facie* case under §§ 12112(a) & (b) of the Americans with Disabilities Act.

Because the Plaintiff is not disabled pursuant to the Americans with Disabilities Act, there is no need for the Court to examine further her failure to accommodate claim.

*B. Plaintiff's Retaliation Claim*

In addition to her discrimination claim, Plaintiff contends she was unlawfully retaliated against in violation of the ADA for filing her original claim with the EEOC. ADA retaliation claims, in the absence of direct evidence of discrimination, are evaluated pursuant to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Stewart v. Independent School Dist. No. 196, 481 F.3d 1034, 1042-43 (8th Cir. 2007). Pursuant to the McDonnel Douglas framework, in order to establish a *prima facie* case of retaliation under the ADA, a plaintiff must show: 1) she engaged in a statutorily protected activity; 2) that an adverse action was taken against her; and 3) a causal connection exists between the adverse action and the protected activity. Amir v. St. Louis Univ., 184 F.3d 1017, 1025 (8th Cir. 1999). If the plaintiff is able to establish a *prima facie* case, the burden will shift to the defendant to show a "non retaliatory reason for the adverse employment action." Stewart, 481 F.3d at 1043 (quoting Green v. Franklin Nat'l Bank of Minneapolis, 549 F.3d 903, 914 (8th Cir. 2006)). If a defendant is able to meet its burden, the burden shifts back to the plaintiff, who must then "present evidence that (1) creates a question of fact as to whether [the defendant's] reason was pretextual, and (2) creates a reasonable inference that [the defendant] acted in retaliation." Id. (quoting Logan v.

Liberty Healthcare Corp., 416 F.3d 877, 880 (8th Cir. 2005)).

Plaintiff's retaliation claims are threefold. First, Plaintiff alleges Defendant wrongfully rejected her initial IPR program application in retaliation for Plaintiff's original EEOC discrimination claim. Second, Plaintiff alleges that Defendant refused to remove Plaintiff from workers' compensation leave in an effort to deny her benefits she was not eligible for while on worker's compensation leave, ultimately resulting in the denial of Plaintiff's second IPR program application. Third, Plaintiff alleges her application for SUB-pay benefits was denied because of her initial EEOC claim.

### i. *Plaintiff's Initial IPR Application*

Defendant argues that neither a retaliatory action nor causal connection exist sufficient for Plaintiff to demonstrate the requisite *prima facie* case of retaliation under the ADA based on Defendant's rejection of Plaintiff's IPR applications. Plaintiff argues that Defendant rejected Plaintiff's IPR applications in retaliation for Plaintiff's outstanding EEOC claims. Defendant argues that Plaintiff had no intention of waiving her claims against Defendant. Defendant further argues its denial of Plaintiff's IPR application was not an adverse employment action and could not have been retaliatory because Defendant's IPR program was a voluntary, conditional offer conditioned upon terms that Plaintiff was unwilling to accept.

The record indicates Defendant extended the IPR program offer to all of its employees with thirty years or more of seniority with the same terms as those offered to Plaintiff. The program was intended to provide Defendant's employees with significant seniority early retirement in an effort to alleviate Defendant's mounting financial burdens. There is no evidence before the Court that Defendant targeted Plaintiff with an incentive based retirement plan

designed solely to force Plaintiff to relinquish her claims against Defendant. Instead, the evidence before the Court is that Plaintiff's first IPR application was rejected due to her failure to waive her claims, a condition of all IPR applications. Because Plaintiff did not agree to the conditions of Defendant's conditional IPR offer, Defendant's rejection of Plaintiff's first IPR application was not retaliatory.

                ii.        *Plaintiff's Second IPR Application*

Plaintiff next argues that after having her initial IPR application rejected because of her express rejection of Defendant's terms, Plaintiff submitted a second IPR application which did not contain a rejection or alteration of Defendant's terms. The evidence before the Court demonstrates that Plaintiff's second IPR application was rejected because Plaintiff was re-classified as being on Code 54 leave, and was subsequently considered ineligible to apply for the IPR package. Plaintiff contends that Defendant refused to remove Plaintiff from Code 54 leave because of Plaintiff's EEOC filing. Plaintiff contends that she was retaliated against because Defendant's refusal to remove her from Code 54 workers' compensation status after she ceased receiving workers' compensation benefits prevented her from participating in Defendant's IPR program offer. Defendant counters that its failure to remove Plaintiff from Code 54 status could not have been retaliatory because Plaintiff had been on the purportedly incorrect Code 54 status *before* Plaintiff filed her initial EEOC claim.

In that regard, Plaintiff's workers' compensation benefits ceased on February 18, 2009. Plaintiff did not file her original discrimination claim under the ADA until March 16, 2009. It is axiomatic that Defendant could not have retaliated against Plaintiff when Defendant's allegedly retaliatory conduct preceded Plaintiff's protected conduct. *See* Stewart, 481 F.3d at 1044

("alleged retaliation which precedes protected conduct cannot logically be used to show causation because a prior event cannot be caused by a later event"). It appears, then, that Plaintiff's initial Code 54 classification was simply an error on the part of the Defendant and was not retaliatory. But it does not follow that Plaintiff's continuing Code 54 classification after her first IPR application was rejected is necessarily attributable to a simple mistake. As noted. Defendant relieved Plaintiff of her Code 54 classification to allow her to file the first IPR application, but when Plaintiff refused to give up her EEOC claim, the IPR application was rejected and Plaintiff was reinstated to a Code 54 classification. At that point, a jury could reasonably infer that Plaintiff was reclassified to Code 54 – and thus precluded from successfully filing her second IPR application – in retaliation for refusing to give up her EEOC Claim. Under these circumstances, the fact that Defendant gave Plaintiff a Code 54 classification before she filed the EEOC claim is immaterial. Therefore, considering the evidence before the Court in a light most favorable to the Plaintiff, there are genuine issues of material fact in dispute as to whether or not Defendant, following the rejection of Plaintiff's initial IPR application, reclassified Plaintiff to Code 54 status in order to preclude her from qualifying for the IPR program when she submitted her second IPR application.

Plaintiff has met her burden of establishing a *prima facie* case of retaliation under the ADA. Although Defendant appears to articulate a non-discriminatory reason for its rejection of Plaintiff's second IPR program application, the evidence before the Court is sufficient to allow a jury to find that Defendant's proffered non-discriminatory reason is a pretext for retaliation. Accordingly, the Court cannot grant summary judgment for the Defendant concerning the rejection of Plaintiff's second IPR application and her subsequent re-classification as a Code 54

employee.

>   *iii. Denial of SUB-Pay Benefits*

Plaintiff next argues that she was retaliated against because her applications for SUB-pay were rejected by Defendant following Plaintiff's initial EEOC filing. To the contrary, Defendant contends its rejections of Plaintiff's SUB-pay applications were not retaliatory because Defendant was classified as away from work on Code 54 leave. Defendant's employees who are away from work on Code 54 leave were ineligible for SUB-pay benefits as a matter of policy for all employees.

Plaintiff's SUB-pay retaliation claim rests on the critical fact that she was classified as a Code 54 employee. Defendant's rejections of Plaintiff's SUB-pay applications prior to August 31, 2009, could not have been retaliatory because the condition leading to the rejections, Plaintiff's status as a Code 54 employee, existed prior to her protected conduct. As mentioned previously, however, when taking the evidence in a light most favorable to the Plaintiff, there are genuine issues of material fact in dispute concerning Plaintiff's re-classification as a Code 54 employee following the Plaintiff's restated desire to pursue her initial EEOC claim in her initial IPR application on or about August 31, 2009. Plaintiff submitted several SUB-pay applications following August 31, 2009, and each was rejected because of Plaintiff's Code 54 status. It is reasonable for a jury to conclude that Plaintiff was re-classified to Code 54 status in retaliation for her EEOC discrimination claim.

Plaintiff has met her burden of establishing a *prima facie* case of retaliation under the ADA. Although Defendant appears to articulate a non-discriminatory reason for its denial of Plaintiff's SUB-pay applications following August 31, 2009, the evidence before the Court is

sufficient to allow a jury to find that Defendant's proffered non-discriminatory reason is a pretext for retaliation. Accordingly, the Court cannot grant Defendant's motion for summary judgment as it pertains to the denials of Plaintiff's SUB-pay applications following August 31, 2009.

**IV. Conclusion**

For the above stated reasons, Defendant's motion for summary judgment will be granted in part, and denied in part. Summary judgment will be granted in favor of Defendant concerning Plaintiff's disability discrimination claim under the ADA. Further, summary judgment will be granted in favor of Defendant concerning Plaintiff's retaliation claim relating to Defendant's rejection of Plaintiff's initial IPR program application. Finally, summary judgment will be granted in favor of Defendant concerning Defendant's rejections of Plaintiff's SUB-pay applications prior to August 31, 2009.

Defendant's motion for summary judgment will be denied concerning Plaintiff's discrimination claim arising out of Defendant's rejection of Plaintiff's second IPR program application and Defendant's denial of Plaintiff's SUB-pay applications following Plaintiff's assertion in her initial IPR program application, on or about August 31, 2009, of her desire to further pursue her EEOC discrimination claim.

Dated this __22nd__ day of December, 2011.

_____
UNITED STATES DISTRICT JUDGE